ETHRIDGE, Chief Justice:
J. H. Pruett, appellant, brought this action in the Circuit Court of Coahoma County against Five County Farmers Association (AAL) (called Five County), seeking damages for the breach by driller of a written, water well-drilling contract. The well was drilled for irrigation purposes on Pruett’s farm. The circuit court gave a peremptory instruction and judgment for defendant, Five County. We think the issue of liability for breach of contract should have been submitted to the jury on conflicting evidence. The question of the measure of damages, if any, is not presented at this stage of the proceeding. The judgment is reversed and the cause remanded.
One controlling and applicable rule is that, in determining whether a party is entitled to a directed verdict, not only the facts expressly testified to, but all inferences reasonably and logically to be deduced from them must be taken as true against the party making the motion.
Pruett has been engaged in the farming business in Coahoma County since 1948. He began irrigating in 1951, and has used irrigation since that time. Before the contract was made, he had land-formed a 301 acre tract for the purpose of constructing an irrigation system on it. On July 3, 1963, he entered into a contract with Five County for the latter to drill an irrigation well on this property to a maximum depth of 120 feet for a price of $4,590.32. There was no specific agreement as to who would make a production test. The contract provided, “Any pump test * * * shall be for * * * hours duration and shall be conducted in the following manner: Until customer is satisfied and well is cleaned out.” The latter part of the foregoing sentence was typed into the printed form. The contract then described the type of pump and other specifications. Purchaser would pay for the installation, “net when system completed and accepted.”
The drilling contractor agreed to furnish all labor and machinery, and to prosecute “the work under this contract diligently and in good workmanlike manner.” It warranted that “all materials and equipment installed shall be new, of standard good quality, and not contain, to his knowledge, any flaws or defects.” The purchaser, Pruett, agreed to take full responsibility for selecting the exact site of drilling.
There was typed into the printed form the following: “Driller guarantees 2,000 gallons per minute from well with one-year warranty on system.” Thus the driller (1) gave a one-year warranty on the entire system, and (2) guaranteed the completed well’s capacity would be 2,000 gallons per minute from the wellhead. The declaration charged and plaintiff’s evidence, if accepted by the jury, would justify a finding that the well was not drilled in a proper and workmanlike manner, and did not produce 2,000 gallons per minute from the wellhead. In view of the conflicting testimony, these were issues of fact for the jury.
The well was completed on July 11, 1963, and on that day, S. C. Adams, superintendent of defendant’s well-drilling department, stated that he tested it and the test showed a production of 2,520 gallons per minute. Adams said that Pruett was present when the test was made, and he told him of the output. On the other hand, Pruett denied this and said he was not present. Pruett testified that, throughout the irrigation seasons of 1963 and 1964, he observed the discharge of water from the well, and in his opinion the discharged pipe was not full or producing the guaranteed quantity. He said that production of 2,000 gallons per minute would have been sufficient to irrigate properly during the sea *436 son, running twenty-four hours per 'day, but the output was never adequate.
Witnesses for both sides agreed that the soil formation was sufficient for the contracted output, and the site was satisfactory. However, during the 1963 irrigation season Pruett said the water was insufficient, and Tedford, appellee’s consulting engineer, told him that he could not understand why they were not getting as much water as they had anticipated, and that he would recheck his figures. Another pump was ordered; it still did not produce sufficiently, and a third pump was installed later in 1963. A new governor was obtained, but the motor continued to race and surge. Appellee continued to represent that the problems were with the engine and equipment. From July through August 1963 appellee’s mechanics worked on the engine and well every day or so. In August Pruett stopped irrigating. In September or October 1963, Adams told Pruett that a new pump and gear head had arrived, and they were installed, but the amounts of water were still not sufficient. Appellee’s agents told him in October 1963 that if the well was not right the next year, Five County would make it right. “We will stay with it until it is right.” In August 1963 Pruett paid Five County the contract price.
In the latter part of June 1964, Pruett activated the well for that season. He said that it again failed to produce sufficient water. Defendant’s mechanics made numerous adjustments, but the engine continued to run improperly. It was surging, that is, racing and flowing, and on July 10 the front end of the engine disintegrated. At Pruett’s request, Five County secured and installed a new diesel engine, but it also gave trouble; another engine was obtained and it also ran hot. Another larger diesel engine was then installed. This was the fourth engine placed on the system. Pruett employed Layne-Central Company to make a test of the well. On December 1, 1964, Layne-Central made a test, which showed that the well was producing 1,336 gallons per minute. In May 1965 Five County made another test, which reflected a production of 1,250 gallons per minute.
Further, there was testimony by several qualified witnesses for Pruett that the well as drilled, by mathematical calculations, could not possibly produce 2,000 gallons per minute; that it would have to be some thirteen feet deeper in order to reach that quantity of water. There was also evidence that the water did not indicate iron encrustation, and that ordinarily wells in this soil formation take considerably longer than one and one-half to two years before the quantity of production is reduced. Plaintiff’s witnesses knew of no wells in the vicinity which had diminished in capacity to this extent in a year and one-half. Yet the test which Pruett made on December 1, 1964, showed only 1,336 gallons per minute.
All of these circumstances and facts, if accepted by the jury, contradicted the accuracy of the well test made by Five County after completion. From them the jury could infer that the well did not produce the warranted capacity in July 1963. Further, this evidence presented an issue of fact as to whether the well was drilled and completed in a workmanlike manner, and thus whether it was in accord with the guaranty on the system.
Five County contends that the well was operated in a way which caused mechanical failure, by Pruett using 6" and 7" pipe connected to the well for irrigation purposes; that the use of such pipe rather than a 10" pipe would result in friction loss and increased pressure, and would require a much larger pump than that specified and proper with 10" pipe. Pruett’s testimony on the use of the smaller pipe is somewhat ambiguous and in some respects evasive. However, he testified that he used initially some 10" pipe to get the water into a ditch 700 feet away; that Five *437 County connected some of the 6" and 7" pipe for a short time in order not to make a big mudhole around the well, but the smaller pipe was disconnected after the 10" was connected. The smaller pipe, he said, \was connected just long enough for Five 'County to make a test; he did not irrigate Through the smaller pipe. Later, Pruett admitted that he got partial irrigation out of the smaller pipe, but apparently he meant That after the original testing he did not uise it for any kind of irrigation. He said, “I never tried to irrigate with it.” The smaller pipe was used in the beginning for test purposes, was never used for irriga-tion, or to put the water into the drainage • ditch — only 10” pipe was used for that purpose. Defendant’s witnesses contradicted this testimony. These were issues of fact •for the jury. Moreover, these circumstances might be relevant to the question of the amount of damages, if the jury should .find liability.
Quick & Grice v. Ashley, 227 Miss. 273, 80 So.2d 40 (1956), involved a suit on a water well-drilling contract for a residence, and 'breach of a guaranty by the driller as to the quantity and quality of water. A judg-ment for plaintiff was affirmed. This ap-pears to be the only Mississippi case on the subject, but there has been a large number of cases in other states involving water well-drilling contracts, and breaches of express warranties as to the quantity of water and the completed well’s capacity. The comprehensive annotation in 90 A.L.R. .2d 1346 (1963), entitled “Water Well-Drilling Contracts,” surveys these decisions. See also 56 Am.Jur.Waters §§ 145-48 (1947); 17A C.J.S. Contracts § 494 at 716-718 (1963); Annot., 55 A.L.R. 1385, 1550-66 (1928).
Reversed and remanded.
JONES, BRADY, PATTERSON and . SMITH, JJ., concur.